## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEROY GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-1419 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Patricia L. Dodge |
| JOHN WETZEL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>[1]

### I.    Relevant Background and Procedural History

Plaintiff, Leroy Gibson, is proceeding *pro se* and was granted leave to proceed *in forma pauperis*.  (ECF No. 3.)  He commenced this civil rights action when he was in the custody of the Pennsylvania Department of Corrections ("DOC") and housed at SCI-Mercer.[2]  (ECF No. 7.)

The Amended Complaint, which is the operative pleading, names SCI-Mercer Superintendent Melinda Adams and former Secretary of the DOC John Wetzel as Defendants. (ECF No. 15.)

According to the allegations in the Amended Complaint, Gibson is at high risk for complications from COVID-19 due to his age (65 years old) and underlying health conditions (high blood pressure and a thoracic aortic aneurysm).  (ECF No. 15 ¶¶ 2-4.)  Gibson alleges that Superintendent Adams failed to protect him from COVID-19 because she did not follow the guidance and protocols recommended by the Centers for Disease Control ("CDC"), state

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Therefore, the undersigned has the authority to decide dispositive motions and enter final judgment.

[2] As of October 31, 2021, Gibson is no longer incarcerated. (*See* ECF 79.)

authorities, and local authorities and that Secretary Wetzel exacerbated the risk posed to him at SCI-Mercer because he implemented a policy of transferring inmates into SCI-Mercer from other DOC facilities experiencing COVID-19 outbreaks. (*Id.* ¶¶ 5–9, 13–14, 16, 27.)

Following this Court's ruling on Defendants' motion to dismiss, the remaining claims are Gibson's Eighth Amendment claims under 42 U.S.C. § 1983 against Superintendent Adams and Secretary Wetzel in their individual capacities.  (ECF No. 80 & 81.)

Pending now before the Court is Defendants' Motion for Summary Judgment, which argues (1) that Gibson has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA") and (2) that even if Gibson has properly exhausted his administrative remedies, Gibson has failed to show deliberate indifference under the Eighth Amendment.  (ECF Nos. 89 & 90.)

Before detailing the relevant facts, the Court notes that Gibson's briefing on this issue is limited, because he asserts Defendants' "attorney [is] bringing the same issue before this court which the Court has ruled [on]."  (*See* ECF No. 94.)  As a result, Gibson's brief appears to refer back to his prior March 24, 2021 brief in opposition to Defendants' Motion to Dismiss.  (*See* ECF No. 94; ECF No. 42.)

After filing his March 24, 2021 brief and before the Court's ruling on Defendants' Motion to Dismiss, Gibson filed a litany of accompanying documents; however, he does not appear to explicitly incorporate these documents by reference in his briefing in opposition to Defendants' Motion for Summary Judgment.[3]  Such documents include: supplemental briefs (*see* ECF No. 47

---

[3] The Court informed Gibson that such documents were improperly filed at the motion to dismiss phase (ECF No. 76 at 2), however, such documents are proper at the summary judgment phase and in its liberal approach to pro se filings, the Court will consider them at this stage.

(March 29, 2021), ECF No. 48 (March 29, 2021), ECF No. 53 (May 2, 2021)), an affidavit (*see* ECF No. 46 (March 29, 2021)), and sworn declarations from other persons incarcerated at SCI-Mercer (*see* ECF No. 68 (Deandre Pringle-Patters, September 13, 2021), ECF No. 69 (Bret Thompson, September 12, 2021), ECF No. 70 (James French, September 12, 2021), ECF No. 74 (Terry Kerstetter, September 27, 2021), ECF No. 75 (Derrick Mearis, September 24, 2021), and ECF No. 78 (Harold Bryan, October 6, 2021)).  In its liberal approach to pro se filings, the Court has considered these filings and finds that the only properly admissible evidence at the summary judgment stage is Gibson's affidavit and the sworn declarations of other SCI-Mercer inmates. (ECF Nos. 46, 68, 69, 70, 74, 75, 78); *see* Fed. R. Civ. P. 56(c).[4]

Gibson has also failed to properly respond to Defendants' Concise Statement of Material Facts (ECF No. 92) as required by Local Rule 56.C.1 by not filing any document responding to each of the Defendants' numbered paragraphs in their concise statement of material fact.  "This rule requires non-moving parties to a motion for summary judgment to file a responsive concise statement in which they must: respond to each numbered paragraph in the movant's concise statement; admit or deny the facts contained in the movant's concise statement; set forth the basis for denial if any fact within the movant's concise statement is not entirely admitted by the non-moving party, with appropriate citation to the record; and set forth, in separately numbered

---

[4] Even if the Court were to consider the various assertions in the Gibson's unsworn briefs, the bulk of these documents generally describe COVID-19 and its characteristics (such as, vulnerable conditions, transmission mechanisms, the long-term effects, recovery rates, guidance and studies from governmental and non-governmental organization, etc.).  The rest of the briefs revisit the issues identified in Gibson's (unverified) Amended Complaint that concern "the housing arrangements at SCI-Mercer (which did not allow high-risk inmates like him to social distance from other inmates), and the alleged repeated transfer of inmates into SCI-Mercer from other correctional facilities experiencing COVID-19 outbreaks," or otherwise discuss issues that post-date Gibson's Amended Complaint.  (ECF No. 80 at 13–14; *see* ECF Nos. 42, 47, 48, 49, 53).

paragraphs, any other material facts at issue." *Peay v. Co Sager*, No. 1:16-cv-130, 2022 WL 565391, at *1 (W.D. Pa. Feb. 1, 2022), *report and recommendation affirmed by*, 2022 WL 562936 (W.D. Pa. Feb. 23, 2022) (citing LCvR 56.C.1.).  "Courts located in the Western District of Pennsylvania require strict compliance with the provisions of Local Rule 56." *Id.* (collecting cases).

The "severe consequences for not properly responding to a moving party's concise statement," are that "[a]ny alleged material facts 'set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.'" *Hughes v. Allegheny Cnty. Airport Auth.*, No. 1:15-cv-221, 2017 WL 2880875, at *1 (W.D. Pa. July 6, 2017) (citing LCvR 56.E), *aff'd*, 728 Fed. Appx. 140 (3d Cir. 2018).

Although courts provide some leniency to pro se litigants when applying procedural rules, pro se litigants may not ignore such rules. *See Peay*, 2022 WL 565391, at *2 (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013) and *McNeil v. United States*, 508 U.S. 106, 113 (1993)).

Thus, the Court will treat Defendants' concise statement of material facts as undisputed but will consider any contradictory facts asserted by Gibson in his brief (which simply incorporates his opposition to the Motion to Dismiss by reference) insofar as they are supported in the record, which includes the affidavit and declarations. *Whetstone v. Fraley & Schilling Trucking Co.*, No. 22-1018, 2022 WL 4533847, at *2 (3d Cir. Sep. 28, 2022).

II.    **Factual Background**

The following facts, which are taken almost verbatim from Defendants' concise statement of material facts, are undisputed (unless otherwise indicated) because Gibson failed to respond to Defendants' concise statement of material facts.

A.   Facts Related to Exhaustion of Administrative Remedies

Defendants submitted affidavits from both Superintendent Adams and Nicole Franz (the Grievance Coordinate at SCI-Mercer and Superintendent Adam's assistant) that describe the grievance procedures at SCI-Mercer.  (ECF Nos. 91-4, 91-5.)

Historically, SCI-Mercer had a box for mail and a box for grievances on every unit, but to alleviate the burden on the Grievance Coordinator and other staff who checked the boxes daily, on March 16, 2020, staff removed the grievance box, and instead, added a "Grievance" label to the existing, and labeled, mailbox.  (ECF No. 92 ¶¶ 28–29.)  This was not a modification of the grievance procedure because of COVID-19.  (*Id.* ¶ 30.)

After the grievance boxes were removed, signs were placed on the walls of the housing units, explaining that grievances could still be placed in the mailbox on the unit and they would be delivered to the grievance coordinator.  (*Id.* ¶ 31.)

Inmates were notified that they could place their grievances in that box, which was locked and retrieved by unit officers who would deliver the contents to the mailroom, or, if they wanted to use a box that only the Grievance Coordinator accessed, they could use the grievance box in the dining hall.  (*Id.* ¶ 32.)  Inmates could also hand grievances directly to the Superintendent's Assistant during her weekly rounds on the units.  (*Id.* ¶ 33.)  As of October 21, 2020, after SCI-Mercer staff were advised that dining halls were not going to reopen and inmates would continue to be fed on their units, the grievance boxes were placed back on the housing units.  (*Id.* ¶ 34.)

The parties dispute whether Gibson filed a grievance relating to the events in his original Complaint.  (*Id.* ¶ 25.)  Defendants assert that in 2020, Gibson submitted 11 grievances, including one grievance that was submitted on April 14, 2020.  (*Id.* ¶ 35.)  Out of the other ten grievances, three were rejected, six received an initial review response without further appeal, and only one was appealed to final review.  (*Id.* ¶ 36.)  The only grievance Gibson appealed to Final Review did not pertain to the claims in the instant lawsuit.  (*Id.* ¶¶ 37–38.) (ECF No. 39-1).

One September 2020 grievance was about being unable to call his family after testing positive for COVID-19.  (*Id.* ¶ 26.)  This grievance was responded to, and Gibson did not appeal the decision.  (*Id.*)  Further, responses were made to three grievances in September 2020 and were not appealed by Plaintiff.  (*Id.* ¶ 27.)

Plaintiff's affidavit states that "during the first week of April of 2020, [he] filed a[n] inmate grievance[] according to DC-ADM-804 and placed it inside a blue bag for all mail within the correction officer's (CO's) station on unit GB because there was no grievance box on GB unit. The grievance box location is within the din[]ing hall where all inmates ha[ve] access, however since SCI-Mercer [has] been on cohost status no inmates are allowed down in the din[]ing hall and all grievances must be placed in the outgoing mail box or mail bag, where any correction staff has access."  (ECF No. 46 ¶ 3.)  Gibson further states that the "grievance coordinate Ms. N. Franz, is defendant Melinda Adams['] assistant and if any grievance is [filed] against defendant Adams [] a person either would get a negative respon[se] or no respon[se] at all because defendant Adams is grievance coordinator Ms. N. Franz['s] boss and it [is] really bias[ed] for her to be involve[d]…." (*Id.* ¶ 4.)

B. Facts Related to COVID-19 at SCI-Mercer

SCI-Mercer consists of units with two-man cells as well as dormitory-style units where groups of up to four inmates reside in each cubicle, and SCI-Mercer lacks sufficient cell-space to eliminate the dormitory-style housing unit. (ECF No. 92 ¶¶ 1–2.) G unit is a dormitory-style unit at SCI-Mercer comprised of two blocks: A block and B block. (*Id.* ¶ 3.) Each block would historically have anywhere from 120 to 124 inmates with four inmates per cubicle. (*Id.*) Before the pandemic, SCI-Mercer would receive, at most, two buses of inmates per week, and by the end of March and into April 2020, the DOC significantly reduced inmate transfers to only those that were necessary. (*Id.* ¶¶ 4–5.) SCI-Mercer received one bus on March 24, 2020 with 10 inmates; one bus on March 27, 2020 with 9 inmates; one bus on March 31, 2020 with 2 inmates; one bus on April 7, 2020 with 1 inmate; and one bus on April 27, 2020 with 11 inmates. (*Id.* ¶ 6.) The procedure the DOC followed at that time was that inmates were tested at the sending facility, transported, tested upon arrival at the receiving facility, and quarantined. (*Id.* ¶ 7.) After a 14-day quarantine and a negative test, inmates were moved to a general population housing unit. (*Id.*)

On August 10, 2020, the first inmate at SCI-Mercer tested positive for COVID-19. (*Id.* ¶ 9.) The inmate was housed on GB unit and on the same day, the entire G unit was placed on enhanced quarantine, meaning movement was limited to showers. (*Id.* ¶ 10.) All inmates in enhanced quarantine are observed and assessed for symptomology and had their temperatures checked twice per day. (*Id.* ¶ 10.)

By mid-August, the DOC stopped inmate transports, and because of a decrease in the inmate population at SCI-Mercer, 56 inmates from GB unit were moved to another unit to help provide social distancing to the extent feasible. (*Id.* ¶ 11.)

Once the population of GB unit was reduced by half, GB unit was set up so that every other cubicle was empty, which meant there were 4 inmates per cubicle, with an empty cubicle in between them.  (*Id.* ¶ 12.)  Staff assigned to work G unit were not working any other units.  (*Id.* ¶ 13.)

Following the first positive case at SCI-Mercer, which was also one of the first cases within the DOC, staff deep cleaned the housing unit and closed the phones and kiosks to prevent spreading the virus.  (*Id.* ¶ 14.)  Hand washing stations were purchased and installed by maintenance outside the bathrooms on G unit and inmates were encouraged to wash their hands before entering the bathrooms to help reduce the spread of the virus.  (*Id.* ¶ 15.)

On August 27, 2020, SCI-Mercer was the first facility to lock down for a 72-hour cleaning.  (*Id.* ¶ 16.)  Other facilities quickly adopted the same approach.  (*Id.*)

G unit remained on enhanced quarantine until November 9, 2020.  (*Id.* ¶ 17.)  During the three-month enhanced quarantine, SCI-Mercer set up and tore down a temporary hospital in the gymnasium; security and commissary worked together to get inmates their commissary; maintenance installed handwashing sinks outside the bathrooms on G unit and installed visiting stations on both units; medical staff were required to complete enhanced medical protocols (*i.e.,* daily temperature and pulse-oxygen checks multiple times per day) while also continuing to deliver medications throughout the facility along with all of their normal daily functions.  (*Id.* ¶ 18.)

From the beginning of the pandemic and through the present, SCI-Mercer closely adhered to guidance from the CDC, including their guidance specific to Correctional and Detention Facilities, the Pennsylvania Department of Health and its own medical team to ensure the safety of inmates and staff.  (*Id.* ¶ 8).  Various proactive, preventive steps were taken statewide, including: requiring that all staff and inmates wear masks; screening all incoming and outgoing inmates;

8

subjecting all staff members to enhanced screening upon entering the facilities; mandating that inmates showing symptoms of the COVID-19 virus will be isolated and staff with symptoms will be sent home; limiting inmate movements and mandating sixteen and then eight-men cohorts; restricting visitation with family and friends to virtual methods; and providing personal protective equipment ("PPE") to all staff members.  (*Id.* ¶¶ 19–20.)  Further, the COVID-19 vaccine and booster shots have been made available to all inmates who wish to accept them.  (*Id.* ¶ 21.)

With regard to Gibson's allegations specifically, the first positive COVID-19 case at SCI-Mercer originated from Gibson's unit.  (*Id.* ¶ 22.)  After that report, the central office directed SCI-Mercer to perform random testing on the vulnerable population of G unit, and Gibson was one of the individuals who was tested.  (*Id.* ¶¶ 22–23.)  Even though he was asymptomatic, he tested positive for COVID-19 and was immediately transferred to a quarantine unit, located near the infirmary with direct access to doctors and nurses.  (*Id.* ¶¶ 23–24.)  Upon completing his quarantine, he was not housed in a dormitory-style setting again.  (*Id.* ¶ 24.)

Although Gibson's Amended Complaint articulates concerns with "the housing arrangements at SCI-Mercer (which did not allow high-risk inmates like him to social distance from other inmates) and the alleged repeated transfer of inmates into SCI-Mercer from other correctional facilities experiencing COVID-19 outbreaks," (ECF No. 80 at 13–14; *see also* ECF Nos. 42, 47, 48) his evidence on such claims is limited.  Gibson's affidavit asserts that at the end of April 2020, Defendants were aware of COVID-19 on unit GB yet placed him back in unit GB. (ECF No. 46 ¶ 5.)  Five months later, Gibson tested positive for COVID-19.  (*Id.*)  The additional sworn declarations from other incarcerated individuals at SCI-Mercer are substantially similar and state that they were housed in "unit GB which houses 124 inmates with 4 sleeping in a cubical with no social distancing" and generally assert that SCI-Mercer has recklessly put inmate lives at

9

risk without further specification as to how that was the case.  (ECF Nos. 68; *see also* ECF Nos. 69, 70, 74, 75, 78.)

### III.    Legal Standard

As the Federal Rules of Civil Procedure provide, summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Id.* (internal citation omitted). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Fed. Rsrv. Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992) (internal citation and quotation omitted).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor.  *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g.*, *Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories . . . sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law").

## IV.   Discussion

### A.  Defendants' Failure to Exhaust Defense

#### 1.  Applicable Standard and Prior Motion to Dismiss Opinion

The Court previously outlined the applicable framework for Defendants' affirmative defense of failure to exhaust administrative remedies:

> The PLRA mandates that an inmate exhaust "such administrative remedies as are available" before bringing a suit challenging prison conditions. 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

> The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)). Exhaustion is mandatory under the PLRA regardless of the type of relief sought and the type of relief available through administrative procedures. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Courts are not given discretion to decide

whether exhaustion should be excused, *Ross*, 136 S. Ct. at 1858, and there is no exception to the exhaustion requirement based on "futility." *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citations omitted).

The PLRA's mandatory exhaustion requirement means not only that a complaint filed before administrative remedies are exhausted is premature and cannot be entertained, but also that a failure to exhaust administrative remedies in accordance with a prison's grievance procedures constitutes procedural default. That is so because "the PLRA's exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93-95; *see also Spruill v. Gillis*, 372 F.3d 218, 227-30 (3d Cir. 2004).

Failure to exhaust is an affirmative defense under the PLRA. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Defendants have the burden of proving that Plaintiff failed to exhaust his available administrative remedies. *See*, *e.g.*, *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). The Court of Appeals has explained that if the defendant demonstrates that the inmate failed to exhaust his administrative remedies, then "the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her."[5] *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019) (citing *Rinaldi*, 904 F.3d at 268). Absent a situation where administrative remedies are not "available," a court may not excuse an inmate's failure to exhaust "irrespective of any 'special circumstances.'" *Ross*, 136 S. Ct. at 1856.

---

[5] The Supreme Court explained in *Ross* that the term "available" means "capable of use" to obtain "some relief for the action complained of." 136 S. Ct. at 1859 (quoting *Booth,* 532 U.S. at 738).

> [It] identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Rinaldi*, 904 F.3d at 266-67 (quoting *Ross*, 135 S. Ct. at 1859-60). *See also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020) (misleading or deceptive instructions from a prison official, as well as clearly erroneous statements, can render a grievance process unavailable). The Court of Appeals has further held "that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement" but only as to the matters complained of and the relief sought in the grievance. *Shifflett*, 934 F.3d at 365.

Importantly, the prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 230-31 ("prison grievance procedures supply the yardstick for measuring procedural default."). Thus, the procedural requirements for exhaustion in a given case "are drawn from the policies of the prison in question rather than from any free-standing federal law.

Here, the DOC's relevant inmate grievance system is set forth in DC-ADM 804. There are several requirements to filing a proper grievance in accordance with DC-ADM 804. Relevant to this case, DC-ADM 804 requires that an inmate place his grievance in one of the fixed lock boxes designated for inmate grievances. DC-ADM 804, § 1(B). It further provides that "[e]ach Facility Manager/designee shall ensure that a fixed lock-box designated for inmate grievances *is on each general population housing unit…and Inmate Dining Halls.*" *Id.* (emphasis added.)

DC-ADM 804 also sets forth a three-tier administrative remedy system. A prisoner is required to present his grievance to the Facility Grievance Coordinator for initial review. *Id.*, § 1(A)(5). The prisoner is required to appeal an adverse determination by the Facility Grievance Coordinator to the Facility Manager. *Id.*, § 2(A). From there the prisoner must appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") for appeal to final review. *Id.*, § 2(B).

(ECF No. 80 at 6–8.)

At the motion to dismiss stage, Defendants submitted a declaration from Michael Bell, a grievance officer with SOIGA, who reviewed Gibson's grievance records during 2020 and stated states that Gibson did not file any grievances for final review relative to the COVID-19 pandemic. (ECF No. 39-1 ¶¶ 10–13.)  The Court notified the parties that it would treat Defendants' Motion as a motion for summary judgment.  (ECF No. 41.)  In response, Gibson filed an affidavit stating that at the beginning of April 2020, he filed a grievance pertaining to his claims, that he did not have access to a grievance lock box due to the COVID-19 restrictions, and that he placed the grievance "inside a blue bag for all mail within the correction officer's … station on unit GB because there was no grievance box on GB Unit."  (ECF No. 46 ¶ 3.)  He further alleges that the grievance was disregarded by Franz.  (*Id.* ¶ 4.)

The Court denied Defendants' Motion to Dismiss, finding it premature to consider Defendants' exhaustion argument given Gibson's declaration and the allegations of modified grievance procedures in place at SCI-Mercer.  (ECF No. 80 at 8–10.)

      2.    <u>Additional Evidentiary Record with Respect to Defendants' Motion for Summary Judgment</u>

Following discovery, Defendants again raise the argument that Gibson has failed to exhaust his administrative remedies.  In doing so, they point to the contradiction between Gibson's initial Complaint in which he stated: "[t]his is not a grievance issue" (ECF No. 7 at 2), and his deposition and affidavit in which he stated that he filed grievances in April 2020 and September 2020.  (ECF No. 90 at 4–5; *see also*, ECF No. 46 ¶ 2; ECF No. 91 at 3–4).  According to Gibson's deposition testimony, his April 2020 grievance "went in the blue bag" and "was complaining about social distancing," whereas his September 2020 grievance was about "when [he] tested positive, [he] was unable to get in contact with [his] family to let them know [he was] alive."  (ECF No. 91 at 3–4).  Defendants assert that the September 2020 grievance was responded to and never appealed, but Gibson disagrees. (*Compare* ECF No. 90 at 5 *with* ECF No. 91-1 at 5.)  With respect to Gibson's assertion that he filed an April 2020 grievance about social distancing, Defendants outline the different grievances that have been received and appear to imply that the April 2020 grievance[6] regarding social distancing was never actually filed.  (ECF No. 90 at 6 (citing ECF Nos. 39-1, 91-3).)

The record evidence reflects a dispute as to whether Gibson exhausted his administrative remedies.

---

[6] Defendants' list of grievances indicate that a grievance was filed on April 14, 2020 regarding "Problems with Staff," and it was rejected.  (ECF No. 91-3.)

On one hand, Defendants' concise statement of material fact, which is undisputed except to the extent contradicted by record evidence, explains the changes to the grievance submission process and states that inmates were informed of the different ways in which they could submit a grievance. (ECF No. 90 at 6; *see also* ECF Nos. 91-4, 91-5.) Further, Gibson's grievance history demonstrates that he knew how to submit grievances from April 2020 to September 2020, having submitted five grievances during the time in which this alternative process was in place. (*See* ECF No. 91-3 (specifying that grievances were filed on April 14, July 2, September 16, and September 18 (two grievances) of 2020)).

On the other hand, in both Gibson's affidavit and his deposition testimony, he stated that he filed the April 2020 social distancing grievance by placing it in a "blue bag." (ECF No. 91 at 4; ECF No. 46 ¶ 2.) This testimony aligns with Franz's own description of the revised grievance submission process, specifically that "[t]he mailbox that was being used for mail and for grievances was a locked box with a slit in the front where mail and grievance[s] could be deposited. At the end of the day, the contents were removed from this box and placed into a blue bag that was taken off the unit and processed accordingly." (ECF No. 91 ¶ 7.)

Taking the facts in the light most favorable to Gibson and drawing all reasonable inferences and resolving all doubts in his favor, there is a genuine issue of material fact as to whether Gibson submitted an April 2020 social distancing grievance by placing it in the blue bag in which the mail and grievances were emptied into.

Thus, the Court will deny Defendants' Motion for Summary Judgment on the issue of administrative exhaustion. Although the Court has found that there exists an issue of material fact with respect to the preliminary issue of exhaustion, the Court may proceed to analyze the merits

in this case. *Kanu v. Lindsey*, 739 F. App'x 111, 114-16, n.3, n.7 (3d Cir. 2018). The Court next turns to Gibson's Eighth Amendment claims.

B. <u>Whether Defendants Were Deliberately Indifferent to Gibson's COVID Risk</u>

As discussed in the Court's prior Opinion, to state an Eighth Amendment claim against a prison official for failure to protect an inmate, Gibson must show that:

> "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." [*Farmer v. Brennan*, 511 U.S. 825, 834 (1994).] The first element sets out an objective inquiry: that the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001). The second element, "deliberate indifference," is a subjective standard: "'the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.'" [*Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012)] (quoting *Beers-Capitol*, 256 F.3d at 125). That is because "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "Deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017).

(ECF No. 80 at 11–12.)

In denying Defendants' prior Motion to Dismiss, the Court considered Gibson's allegations of his risk factors, SCI-Mercer's housing arrangements, and the transfer of inmates into SCI-Mercer. (*See generally*, ECF No. 80.) The Court found that although Gibson was able to state a claim that Defendants did not follow CDC and state and local guidance and protocol at SCI-Mercer, this was nonetheless a "close call." (ECF No. 80 at 13–14.) Now, at the summary judgment phase, the Court must consider the record evidence on the same issues.

Defendants argue that Gibson has not, and cannot, establish the subjective prong for an Eighth Amendment claim, specifically that Defendants consciously ignored the threat posed by the COVID-19 virus.  (ECF No. 90 at 9.)  In doing so, Defendants detail the measures that were taken when the first COVID-19 case was reported at SCI-Mercer, including placing the entire unit on enhanced quarantine and reducing the population of the unit 50% for social distancing (to the best of its ability) by maintaining an empty cubicle in between occupied cubicles Gibson's unit. (*Id.* at 9.)  Defendants further detail the reduction in inmate transfers and the fact that there were only five transfers with a total of 33 inmates between March 24, 2020 and April 27, 2020.  (*Id.*) Ultimately, inmate transfers stopped mid-August.  (*Id.*)  As such, Defendants argue that Gibson has failed to point to any evidence that Defendants had reason to believe that the measures employed by the DOC as a whole, and within SCI-Mercer in particular, were inadequate.  (*Id.*)

Defendants further argue that Gibson has failed to demonstrate the objective component of a deliberate indifference claim, because the DOC undertook a series of preventative steps to limit the spread of COVID-19.  (*Id.* at 9–10 (detailing general policies including mask wearing, screening protocols, isolation of symptomatic individuals, limitations on inmate movement, visitor restrictions, PPE, and COVID-19 vaccines and booster, sanitation efforts, and education efforts, as well as steps specific to the G unit, including random testing of vulnerable populations (including asymptomatic individuals) and quarantining of positive individuals).)

The Court finds that viewing the facts in the light most favorable to Gibson, the Defendants have met their initial burden of identifying the evidence that shows the lack of a genuine issue of material fact by pointing to the policies and procedures that were implemented at SCI-Mercer, within the G unit, and with respect to Gibson specifically.

17

At this point, therefore, it is incumbent upon Gibson to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted).  As discussed, Gibson does not address either of Defendants' arguments on the issue of deliberate indifference and instead refers the Court back to his Motion to Dismiss brief.  However, the Court has considered Gibson's affidavit and the sworn declarations of other inmates in resolving the pending motion.  (ECF Nos. 46, 68, 69, 70, 74, 75, 78).

None of these documents demonstrate a genuine issue of material fact, and Gibson has failed to set forth specific facts that create a genuine issue for trial on the issue of deliberate indifference.  The mere fact that Defendants were aware of COVID-19 on the G unit and later placed Gibson back in the G unit, along with the fact that (at some unspecified time) the GB unit housed 124 inmates with no social distancing, fail to show that Defendants "knowingly and unreasonably disregarded an objectively intolerable risk of harm," *Beers-Capitol*, 256 F.3d at 132, or that Defendants actually knew or were aware of the excessive risk to Gibson's safety, *Bistrian*, 696 F.3d at 367.  In light of the undisputed policies and procedures that Defendants implemented and Gibson's failure to contextualize why the few facts he has proffered as part of the record create a genuine dispute of material fact, the Court finds that no reasonable jury could return a verdict in Gibson's favor.

## V.   Conclusion

Based upon the foregoing, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.  (ECF No. 89.)

An appropriate Order follows.

18

BY THE COURT:

Dated: November 30, 2022                    /s/ Patricia L. Dodge
                                            PATRICIA L. DODGE
                                            United States Magistrate Judge